**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


AMERICAN FEDERATION OF STATE, )
COUNTY AND MUNICIPAL EMPLOYEES, )
LOCAL 77, )
 )
        Plaintiff, )
 )
        v. )        1:18cv228
 )
DUKE UNIVERSITY, )
 )
        Defendant. )


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the Court on (1) "Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction [Fed. R. Civ. P. 12(b)(1)]" (Docket Entry 13 (brackets in original)) (the "Dismissal Motion") filed by Duke University (the "Defendant" or "Duke") and (2) "Plaintiff's Motion to Confirm and Enforce Arbitration Award, for Summary Judgment, and for Attorneys' Fees" (Docket Entry 15) (the "Confirmation Motion") filed by the American Federation of State, County and Municipal Employees, Local 77 (the "Plaintiff" or the "Union"). For the reasons that follow, the Court should grant in part and deny in part both motions.

## BACKGROUND

On March 20, 2018, Plaintiff filed suit to "confirm and enforce [an] arbitration award issued by Arbitrator [Robert W.]

Kilroy" (Docket Entry 1 at 6)[1] in December 2017 regarding Defendant's employment of Reginald Thorpe ("Mr. Thorpe"). (See generally Docket Entry 1 (the "Complaint"); see also Docket Entry 1-7 (the "Arbitration Award" or the "Award").) In June 2018, Defendant filed an Answer, which maintained that "[t]he Complaint should be dismissed for lack of subject matter jurisdiction due to the doctrine of mootness. [Defendant] reinstated Mr. Thorpe reinstated [sic] on May 1, 2018, fully paid the amount directed by [the] Arbitrat[ion A]ward, and continues to employ Mr. Thorpe. There is no case or controversy to be decided by the Court and Plaintiff's claim is moot." (Docket Entry 6 at 5.) Thereafter, Plaintiff filed the Confirmation Motion and Defendant filed the Dismissal Motion, each of which the other party opposes. (See Docket Entries 13, 15, 18, 20.) As relevant to the pending motions, the record reflects the following:

For eight years prior to his discharge on October 20, 2016, Mr. Thorpe served as an Environmental Services Division Technician "whose duties consisted mostly of cleaning and waxing floors daily on several designated floors" of one of Defendant's hospital buildings (Docket Entry 1-7 at 1). (See id. at 2; see also Docket Entry 15-10, ¶ 1.) In connection with this employment, Mr. "Thorpe was . . . a member of the bargaining unit represented by

_____

    1 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

2

[Plaintiff]." (Docket Entry 15-1, ¶ 3; <u>accord</u> Docket Entry 15-10, ¶ 6.) Plaintiff and Defendant "have a collective bargaining relationship," currently governed by a collective bargaining agreement (a "CBA") that "went into effect on July 1, 2017." (Docket Entry 17-1 at 2.)[2]

On September 7, 2016, a sales clerk at a local gas station

> reported to Durham Police[ that] an individual while making his purchase had clearly exhibited his penis to her. She was unable to identify this person. However, a few days later, the sales clerk reported to the detective handling the matter, the same unidentified individual appeared again, without any exhibition, and was dressed with a Duke University shirt. After making copies of the security surveillance tapes and confirming with Duke Police and personnel badges, [Mr. Thorpe] was identified and was charged with a violation of [North Carolina General Statute Section] 14-190.9 "Indecent Exposure" in case number 16CR58523 in Durham County District Court.

(<u>Id.</u>)[3]

"In early October 2016, [Defendant] told [Mr. Thorpe] to meet with two police officers" (Docket Entry 15-10, ¶ 2), Duke Police Officer Arthur Holland ("Officer Holland") (<u>see</u> <u>id.</u>, ¶ 14) "and Officer Buffy Jones from the Durham Police Department" ("Officer

---

2    The previous CBA became effective July 1, 2014. (<u>See</u> Docket Entry 1-2 at 1; <u>see also</u> Docket Entry 1, ¶ 11.)

3    In its post-arbitration brief, Defendant asserted that, "[i]n a later incident, Mr. Thorpe wore a Duke employee badge when he again exposed his genitals to the female BP employee at the store" (Docket Entry 15-4 at 6); however, as the arbitrator noted, no exhibition occurred at this later incident (<u>see</u> Docket Entry 1-7 at 2; <u>see also</u> Docket Entry 20-1, ¶¶ 9, 10 (indicating that alleged additional exposures occurred prior to incident on September 7, 2016)).

Jones") (Docket Entry 15-3 at 7;[4] Docket Entry 15-1, ¶ 12; see also

Docket Entry 15-10, ¶ 2). "The officers told [Mr. Thorpe] that

[he] had been charged with indecent exposure based on an incident

that they believed occurred at a Durham convenience store on

September 7, 2016." (Docket Entry 15-10, ¶ 2.) "The officers did

not arrest [Mr. Thorpe]," but "instead allowed [him] to report to

the Durham Police Department on [his] own, which [he] did." (Id.,

¶ 3.) "On or around October 10, 2016, [Defendant] gave [Mr.

Thorpe] a letter discussing the indecent exposure charge, and

suspending [his] employment pending an investigation." (Id.,

¶ 4.)[5] On or before October 17, 2016, Mr. Thorpe entered into a

---

4  As a general matter, "[s]tatements in briefs are not evidence." Dillon v. BMO Harris Bank, N.A., No. 1:13cv897, 2014 WL 911950, at *2 (M.D.N.C. Mar. 10, 2014) (collecting cases). Here, however, Plaintiff's Business Manager Michael Gibson averred that he "reviewed the statement of facts from [Plaintiff's post-arbitration] brief, and believe[s] it is consistent with the evidence introduced at the arbitration" (Docket Entry 15-1, ¶ 12), and Defendant does not contest the accuracy of the evidence recounted in that brief — indeed, Defendant relies on Plaintiff's post-arbitration brief in its own description of the evidence offered at the arbitration (see, e.g., Docket Entry 20 at 5, 6). Under these circumstances, Gibson's affidavit effectively verifies the evidentiary assertions in Plaintiff's post-arbitration brief, rendering their consideration appropriate. See generally Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (emphasis in original)).

5  In relevant part, the letter states:

On October 3, 2016, [Defendant] w[as] made aware of [Mr. Thorpe's] arrest and the charge for which [he] w[as] detained:

(continued...)

deferred prosecution agreement with the Durham County District Attorney's Office.  (See Docket Entry 15-2 at 1.)

On October 20, 2016, Defendant issued Mr. Thorpe "a Notice of Disciplinary Action citing:    'VIOLATION OF WORK RULES #13 Falsifying University records, including intentional failure to accurately record time records, or registering the time card of another employee without proper authorization,'" resulting in his discharge.  (Docket Entry 1-7 at 2; see also Docket Entry 15-12 at 2 (the "Disciplinary Notice").)    The Disciplinary Notice

_____

5(...continued)
                    Indecent Exposure

According to the Duke Arrest Policy:  The arrest of an
employee, whether on or off campus, may result in
corrective action.  Corrective action depends upon a
review of all the factors involved, including whether or
not the employee's action was work-related, the nature of
the action, or resultant circumstances which adversely
affect attendance.  Such corrective action may be up to
and including suspension or termination.

Based on the events surrounding [Mr. Thorpe's] arrest,
[he] w[as] trespassed from all Duke University and Duke
University Health System property by Duke University
Police except in the event of a medical emergency.
Subsequently, [he] cannot be returned to work until the
trespass order is lifted.

Effective October 3, 2016, [Mr. Thorpe is] suspended from
active employment with pay pending investigation.

If, or when the trespass by Duke Police is lifted,
[Defendant] will make a determination about [Mr.
Thorpe's] continued employment with [Defendant].  Of
course, if [Mr. Thorpe] choose[s] to resign from [his]
positon [sic], [he] may do so voluntarily at any time.

(Docket Entry 15-11 at 1 (formatting in original).)

incorporates a letter to Mr. Thorpe (<u>see</u> Docket Entry 15-12 at 2) that states, in relevant part:

> This letter is to update [Mr. Thorpe] regarding [his] employment status with Duke University Hospital Environmental Services. On Monday, October 3, 2016, [Duke] w[as] made aware of [his] arrest and the charge for which [he] w[as] arrested: *Indecent Exposure*. Also on that date, [Duke] w[as] made aware that [Mr. Thorpe] had been trespassed by Duke University Police from all Duke University and Duke University Health System property except in the case of a medical emergency.

> On October 10, 2016, a certified letter was mailed to [Mr. Thorpe] outlining [his] employment status with Environmental Services. Due to the serious nature of the charge against [him] and the uncertainty as to the length of time that may have been required to conclude the investigation, [Mr. Thorpe] w[as] suspended from active employment with pay pending investigation.

> As part of the investigation process, [Mr. Thorpe] w[as] provided the opportunity to submit any information that [he] thought should be considered before a final decision was made in the matter. On October 12, 2016, [Mr. Thorpe] met with [a Duke employee] and [his] Union representative, Charles Gooch. The meeting was an opportunity for [Mr. Thorpe] to provide testimony to the incident that occurred on Wednesday, September 7, 2016 at approximately 7:40 pm at a BP Gas Station on University Avenue which led to [his] arrest and subsequent suspension with pay pending investigation. During the meeting, [Mr. Thorpe] elected not to provide any information concerning the incident in question.

> As part of and during the course of [Duke's] investigation of the incident, it was determined [Mr. Thorpe] w[as] clocked in at work as a Floor Finisher at Duke University Hospital and had not received permission to leave work, nor did [he] clock out when [he] left the premises. This behavior constitutes falsification of time and is dischargeable with the first offense. Therefore, the decision has been made to terminate [his] employment effective today, Thursday, October 20, 2016 for violation of Work Rule 13: Falsification University

Records, including intentional failure to accurately record time records.

(Id. at 1 (emphasis in original); see also Docket Entry 1-7 at 2.)

Plaintiff filed "[a] timely grievance . . . contesting the matter of discharge and the misapplication of Work Rules." (Docket Entry 1-7 at 2.) The grievance (1) contends that Defendant violated "Article 13 Disciplinary Action," (2) identifies the relevant issue as "[w]hether [Mr. Thorpe] was disciplined for just cause — did [Mr. Thorpe] violate Duke University Work Rule #13?," and (3) seeks as a remedy that "[Mr. Thorpe] is reinstated with back pay, disciplinary action is removed from the file and [Mr. Thorpe] is otherwise made whole including primary work, unit of assignment and shift." (Docket Entry 1-5 at 1.) At the grievance hearing, Plaintiff "contend[ed] that [Defendant] violated Article(s) 13, Disciplinary Action." (Docket Entry 1-6 at 1.) The decision on the grievance hearing identified the relevant issue as follows: Mr. Thorpe "was discharged for violation of Work Rule #13 - Falsifying University records[] . . . . [Plaintiff] questioned whether [Mr. Thorpe] was disciplined for cause, whether [Mr. Thorpe] violated Duke University Work Rule #13." (Id.) At the hearing, Defendant's witness "shared that there was an incident that occurred offsite on [September 7, 2016], which led management to learn that Mr. Thorpe was not in the workplace when he should have been[;]" however, "[b]oth management and [Plaintiff] declined to discuss the specifics of the incident." (Id. at 2.)

Defendant denied the grievance on January 24, 2017. (Docket Entry 15-1, ¶ 6.) Six days later, the Durham County District Attorney's Office dismissed the indecent exposure charge against Mr. Thorpe. (See Docket Entry 1-7 at 5; Docket Entry 15-2 at 1.) Plaintiff pursued the grievance to arbitration (Docket Entry 15-1, ¶ 6; see generally Docket Entry 1-7), which the parties conducted before Arbitrator Kilroy on November 9, 2017 (see Docket Entry 1-7 at 1).

Defendant called Mr. Thorpe as its first witness at the arbitration. (Docket Entry 15-10, ¶ 13.) "[Defendant] asked [him] if [he] exposed [him]self in the convenience store. [He] denied that [he] exposed [him]self because [he] did not expose [him]self. [Defendant's] attorney questioned [him] extensively, under oath, about details surrounding the alleged incident of indecent exposure." (Id.; see also Docket Entry 15-15, ¶ 4 ("At the arbitration, [Defendant's] attorney questioned Mr. Thorpe extensively about the alleged incident of indecent exposure on September 7, 2016.").)

Defendant then called Officer Holland, who testified regarding his meeting with Mr. Thorpe in October 2016 "and the circumstances leading up to [Mr. Thorpe's] initial suspension, including how he came to learn about the criminal charges." (Docket Entry 15-10, ¶ 14.) Officer Holland also testified "about his conversations with a Durham police officer about the criminal investigation"

(Docket Entry 15-15, ¶ 5), explaining that "he never spoke to the gas station attendant, and that he instead relied on what Officer Jones told him the attendant told her" (Docket Entry 15-3 at 14). During Officer Holland's testimony, Defendant played a surveillance video from the gas station depicting "the September 7, 2016 incident" (Docket Entry 15-10, ¶ 11), pausing the video "periodically [to] ask[ Officer] Holland questions about what it showed." (Id., ¶ 15.)[6] Officer Holland testified that he believed the video showed Mr. Thorpe exposing himself, "discuss[ing] specific things he found incriminating, including what he believed were furtive movements [Mr. Thorpe] was making and the fact that he believed [Mr. Thorpe] moved bags on the counter in order to 'open a line of sight' for [the] exposure." (Id.)[7] Officer Holland further testified that Mr. Thorpe admitted exposing himself in their first meeting. (See id.)

Plaintiff also called Mr. Thorpe as its first witness. (See id., ¶ 16.) Mr. Thorpe "denied having ever admitted to exposing [him]self. [He] never admitted to exposing [him]self because [he]

_____

6  Per another witness at the arbitration, the surveillance video "seemed low-quality and low-resolution" and "showed a man walk up to a convenience store counter," but, "[b]ased on what [the witness] saw at the arbitration, [she] could not tell if he was exposing himself or not.  It was much less clear than [she] expected."  (Docket Entry 15-15, ¶ 7.)

7  Per Plaintiff's post-arbitration brief, "the video was not introduced as an exhibit" at the arbitration.  (Docket Entry 15-3 at 31.)

did not expose [him]self." (Id.)  Mr. Thorpe also "testified about how the indecent exposure charge was voluntarily dismissed by the State," and Plaintiff entered the voluntary dismissal into evidence.  (Id.)  Defendant's attorney cross-examined Mr. Thorpe, asking "questions about [(1)] the alleged incident of indecent exposure," (2) "what the surveillance video had shown," and (3) whether Mr. Thorpe exposed himself, which he "again denied." (Id., ¶ 17.)  Plaintiff's chief steward and one of Mr. Thorpe's former coworkers also testified at the arbitration, respectively denying (1) knowledge of any publicity regarding the criminal allegations or of any coworkers who preferred not to work with Mr. Thorpe due to the allegations and (2) objection to working with Mr. Thorpe in light of the criminal charge.  (See Docket Entry 15-1, ¶ 9; see also Docket Entry 15-15, ¶ 8.)

After the evidence closed, Plaintiff and Defendant "agreed to provide written arguments to the arbitrator by December 8, 2017." (Docket Entry 15-1, ¶ 11.)  Defendant's post-arbitration brief frames the issue presented as:  "Did [Defendant] discharge [Mr.] Thorpe for just cause?," and specifies as a relevant CBA provision Article 13, which states that "[n]o employee will be disciplined without just cause."  (Docket Entry 15-4 at 2.)  It further identifies Work Rule 13 as the only relevant Work Rule.  (See id.) Defendant's post-arbitration brief relies on the alleged indecent exposure on September 7, 2016, in two respects.  First, it

maintains that this alleged indecent helps prove that Mr. Thorpe exceeded his allotted thirty-minute lunch break. (See, e.g., id. at 7 ("[E]ven if he left work at 7:30 pm to begin his break, as he claimed, there was simply no way for him to be back working by 8 pm and carry out all the acts, and illegal acts, he now readily admits occurred . . . .").) Second, Defendant's post-arbitration brief contends that the alleged exposure motivated the charged falsification, on the theory that Mr. Thorpe wished to create an alibi for the time in question. (See, e.g., id. at 6-7 ("His decision to submit a false time card was an intentional calculated effort to create an alibi for his whereabouts in the event someone recognized him at the BP station.").) In sum, Defendant post-arbitration brief asserts:

> In this case, the discharge should be clearly upheld, not only due to the clear time card falsification, but also because of the intentional nature of the misconduct. Later that pay period, Mr. Thorpe alerted his supervisor to alter his time records on two days to make his time correct. He obviously knew the proper method to correct inaccurate time records and admitted as much.
>
> Duke has proven that Mr. Thorpe secretly left work for over 30 minutes but submitted a time record to falsely indicate he worked during the time of his criminal activity. Mr. Thorpe's candid admission that such conduct violates Work Rule 13 makes this an easy case to uphold the termination for just cause.
>
> Based on the foregoing, it is clear that the termination of [Mr.] Thorpe was supported by just cause and this grievance should be denied.

(Id. at 8 (citation and heading omitted).)

In turn, Plaintiff's post-arbitration brief states that "[t]he issue is whether [Mr. Thorpe] was terminated for just cause, and, if not, what the remedy shall be." (Docket Entry 15-3 at 3.) It likewise identifies Article 13 as a relevant CBA provision and Rule 13 as a relevant Work Rule (id. at 4, 5), along with Rule 3 ("failure to report back to the work station") and Rule 15 (regarding commission of crimes) (id. at 5). Plaintiff's post-arbitration brief maintains that Defendant failed to justify its termination of Mr. Thorpe for violating Rule 13. (See id. at 19-27.) It further argues that Defendant could not justify Mr. Thorpe's discharge on the basis "of his alleged criminal conduct" (id. at 28) for a couple of reasons. To begin, the relevant "CBA specifically requires that '[t]he subject of the disciplinary action as stated at the time of issuance to the employee shall constitute the sole and entire subject matter of the disciplinary action'" (id. (brackets in original)), and "[h]ere Duke has never argued that Mr. Thorpe was terminated because of his alleged criminal conduct, and has never argued that reinstatement is not possible because of the dismissed misdemeanor charge" (id.; see also id. ("Mr. Thorpe's termination notice stated that he was terminated for allegedly falsifying records")). In addition, Plaintiff's post-arbitration brief contends, "[i]f Duke wanted to discipline Mr. Thorpe for the alleged misconduct giving rise to the criminal charge, it would have charged him under Work[] Rule 15"

and "also should have explained its decision in light of Personnel Policy D-20," which "provid[es] guidance for 'Actions on Employee Arrest.'" (Id. at 29.)

Finally, Plaintiff's post-arbitration brief argues that Mr. Thorpe's alleged indecent exposure could not independently justify his discharge. (See id. at 29-32.) In support of this contention, Plaintiff maintains that "[t]here are well-defined parameters for when arrests for off-duty misconduct can support an employee's termination. The general rule is that an employer cannot discipline an employee for off-duty conduct unless the conduct (1) harms the employer's business, (2) adversely affects the employee's ability to perform his or her job, or (3) leads other employees to refuse to work with the offender." (Id. at 29 (internal quotation marks omitted).) Plaintiff maintained that Defendant did not satisfy this test, in part because it "failed to prove Mr. Thorpe actually engaged in the misconduct" (id. at 30), and, in any event, "[t]here [wa]s no evidence the dismissed misdemeanor had a demonstrable effect on Duke's business" (id. at 31), Mr. Thorpe's ability to perform his job, or other employees' willingness to work with him. (See id. at 29-32.)

Plaintiff's post-arbitration brief concludes:

> If Duke wished to terminate Mr. Thorpe because of
> the criminal allegation, it should have notified him of
> that fact. It should have allowed the Union and Mr.
> Thorpe to defend against its position. It should have
> sought to justify Mr. Thorpe's termination under its
> relevant workplace rules and policies applicable to

criminal charges.  And it should have been required to
prove that the nature of the criminal charge justified
summary termination under the principles of just cause.
It should not have fabricated a non-existent rule about
clocking out for lunch breaks, and claimed that violating
the non-existent rule amounted to falsifying records
under a different workplace rule that allowed for
immediate termination.

     "The union's real interest in disciplinary matters
is fairness."  Duke has never claimed Mr. Thorpe should
be disciplined for his misdemeanor charge or the alleged
misconduct underlying the charge.  Instead, it claimed it
actually terminated him for violating a non-existent
workplace rule which, incidentally, required it to
present evidence related to the underlying criminal
dispute.

     Duke's position is an affront to the principles of
just cause.  Mr. Thorpe was fired for falsifying records.
The evidence shows he did not falsify any record.  His
dismissed misdemeanor charge should not cloud this
straightforward issue.  Mr. Thorpe should be reinstated
to his position and awarded full back pay.

     For the foregoing reasons, the Union respectfully
requests that the Union's grievance be sustained and that
Mr. Thorpe be reinstated to his position with full back
pay.  The Union requests that the Arbitrator retain
jurisdiction for a reasonable period to allow the parties
to calculate the value of any back pay to which Mr.
Thorpe is entitled.

(Id. at 32-33 (citation and heading omitted).)

On December 20, 2017, Arbitrator Kilroy issued the Arbitration

Award.  (See Docket Entry 1-7 at 6.)  The Arbitration Award

commences with certain factual findings, including that Mr. Thorpe

testified that he "stopped at a local gas station" during his lunch

break on the day in question (id. at 1) and, "that same evening,

the sales clerk at the gas station reported to Durham Police" that

an unknown individual had exposed himself to her "while making his

14

purchase" (id. at 2).  Next, the Arbitration Award notes that
officials subsequently identified Mr. Thorpe as that individual and
charged him with indecent exposure.  (See id. at 2.)  For
"applicable contractual provisions," the Arbitration Award
identifies Work Rules 3, 13, and 15, as well as Article 5, which
specifies, in part, that Defendant possesses "the right to . . .
suspend, discipline and discharge employees for cause." (Id. at 3
(emphasis and all-cap font omitted).)  It then identifies the
relevant issue as:  "Was there just cause to discharge [Mr.
Thorpe]?  If not, what shall the remedy be?" (Id. at 4.)

Thereafter, "[b]ased on the evidence, the arguments of the
parties and the [CBA,] the Arbitrator f[ou]nd[] no just cause to
discharge [Mr. Thorpe] for a violation of Work Rule 13." (Id.)  As
to this conclusion, the Arbitration Award explains:

> The Arbitrator draws his jurisdiction and authority
> from the four corners of the [CBA].  He does not sit to
> disperse his own brand of justice.  Additionally, the
> Arbitrator may not legislate or fill-in missing gaps in
> the interpretation and application of the [CBA] or work
> rules, he is limited by the written words.  The
> Arbitrator's function is to weigh the evidence of the
> alleged violation of the work rule.
>
> [Defendant's] reliance upon Work Rule 13 to
> discharge [Mr. Thorpe] rests upon attenuated reeds, not
> solid support.  The Arbitrator understands and
> appreciates the concern of [Defendant] to uphold and
> maintain its sterling reputation and public image.  The
> Arbitrator is conscious of the disparagement to its
> reputation to have and hold an employee charged as [Mr.
> Thorpe] with a particularly unpleasant and distasteful
> crime.  However, these circumstances are not sufficient
> in itself to ignore [Mr. Thorpe's] rights under the
> [CBA].  Finally, the Durham County District Attorney

chose to enter into a Deferred Prosecution in the matter pursuant to [North Carolina General Statute Section] 15A-1341(a1) upon [Mr. Thorpe's] plea of guilty. Public records in the office of Archie L. Smith III, Clerk of Superior Court, Durham County show the matter was dismissed on January 30[, ]2017 upon [Mr. Thorpe's] completion of conditions, fine and costs.

(Id. at 5 (citations omitted).)[8]

The Arbitration Award then concludes:

Finally, as to [Mr. Thorpe's] violation of Work Rule 13, there is no evidence that [Mr. Thorpe] falsified a University record and or intentionally failed to accurately record time. He swiped in at 15:06 and swiped

_____

8   As a matter of North Carolina law, and unlike with a conditional discharge, an individual placed on deferred prosecution neither "pleads guilty to [n]or is found guilty of" a charge. Compare N.C. Gen. Stat. § 15A-1341(a1) ("Deferred Prosecution. — A person who has been charged with a Class H or I felony or a misdemeanor may be placed on probation as provided in this Article on motion of the defendant and the prosecutor if the court finds [certain specified] facts," including that "[p]rosecution has been deferred by the prosecutor pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct," as well as that "[e]ach known victim of the crime has been notified of the motion for probation by subpoena or certified mail and has been given an opportunity to be heard"), with N.C. Gen. Stat. § 15A-1341(a4) ("Conditional Discharge. — Whenever a person pleads guilty to or is found guilty of a Class H or I felony or a misdemeanor, the court may, on joint motion of the defendant and the prosecutor, and without entering a judgment of guilt and with the consent of the person, defer further proceedings and place the person on probation as provided in this Article for the purpose of allowing the defendant to demonstrate the defendant's good conduct if the court finds [certain specified] facts," none of which involves an agreement between the prosecutor and the defendant); see also State v. Baker, No. COA15-600, 247 N.C. App. 398 (table), 786 S.E.2d 432 (table), 2016 WL 1743595, at *5 (May 3, 2016) (unpublished) ("Generally, a deferred prosecution agreement results in a defendant's 'admission of responsibility' as described on an AOC-CR-610 'Motion/Agreement and Order to Defer Prosecution' Form, or an acknowledgement of 'guilt in fact,' but this admission or acknowledgement does not amount to a guilty plea.").

out at 23:57 for 8.4 hours pay. The[r]e is no evidence of deceit or intent to get financial gain. According to Merriam Webster Dictionary, the definition of RECORD is:

1.  a(1): to set down in writing: furnish written evidence of (2): to deposit an authentic official copy of • record a deed
    b: to state for or as if for the record • voted in favor but recorded certain reservations
    c(1): to register permanently by mechanical means • earthquakes recorded by a seismograph (2): INDICATE, READ • the thermometer recorded 90°[]

2.  : to give evidence of

3.  : to cause (sound, visual images, data, etc.) to be registered on something (such as a disc or magnetic tape) in reproducible form

The conduct of [Mr. Thorpe], whether by commission [or] omission, does not meet the above definition, and no allegedly falsified document was introduced into evidence. [Defendant's] Exhibit 4 clearly defines [Mr. Thorpe's] time and duties on shift. Simply put, the credible evidence puts [Mr. Thorpe] at the gas station at 7:46 pm when he should "resume floor care activities" at 7:30 pm at the work site. [Mr. Thorpe] simply failed to report back to his work station at the scheduled conclusion of a work break or meal period, a violation of Work Rule 13 [sic].

    For All The Foregoing Reasons, The Arbitrator Makes The Following Award:

    Grievance, granted as to the discipline of discharged.

    [Mr. Thorpe's] discharge is reduced to a 30 working day suspension beginning October 20,[ ]2016 through and including December 1, 2016.

    [Mr. Thorpe] is to be made whole for all lost wages and benefits up to his date of reinstatement, including any accrued seniority.

Within ten days of receipt of th[e Arbitration] Award, [Mr. Thorpe] shall submit an Affidavit itemizing all interim earning to date of reinstatement including any NC Employment Security Commission payments which amount shall offset any backpay due.

The Arbitrator shall retain jurisdiction in the matter for 60 days to determine any disputes as to the above remedies and supplemental Award.

(Id. at 5-6 (heading omitted) (formatting, capitalization, and all-cap font in original).)

Following receipt of the Arbitration Award, "Mr. Thorpe provided an affidavit stating his interim earnings" (Docket Entry 17-1 at 3), and "[Plaintiff] attempted to secure Mr. Thorpe's reinstatement," but "[Defendant] refused to reinstate Mr. Thorpe" (Docket Entry 15-1, ¶ 15). (See also Docket Entry 15-10, ¶¶ 18 ("[Mr. Thorpe] was ready and eager to return to [his] position at [Defendant]."), 19 ("[Defendant] did not reinstate [Mr. Thorpe] to [his] position.").) Plaintiff therefore filed the instant action to enforce the Arbitration Award. (See Docket Entry 1 at 5-6.) "After [Plaintiff] initiated this legal action, [Defendant] informed [Plaintiff's Business Manager, Michael Gibson (see Docket Entry 15-1, ¶ 1)] that it was going to reinstate and then immediately suspend Mr. Thorpe to further investigate the alleged incident of indecent exposure on September 7, 2016" (id., ¶ 16).

Kathryn Boyd "investigated [Mr.] Thorpe's indecent exposure charge in [her] capacity as Legal Fellow at the Office of Counsel for [Defendant] from April 2018 through June of 2018." (Docket

Entry 20-1, ¶ 4.)  On April 10, 2018, Boyd met with a Senior Human Resources Representative at Defendant, who gave her "Duke Police Department's Report on [Mr.] Thorpe's indecent exposure incident occurring on September 7, 2016." (Id., ¶ 5.)  The next day, Boyd spoke with Officer Holland, who "informed [her] that the Durham Police Department conducted an initial investigation into the indecent exposure incident occurring at the BP Family Fare on September 7, 2016.  Officer Holland referred [her] to Investigator Buffy Jones from the Durham Police Department because he believed that [Officer] Jones would have additional information regarding the incident." (Id., ¶ 6.)

"On or around April 12, 2018, Officer Holland gave [Boyd] the video tape from the BP Fan Fare allegedly showing Mr. Thorpe exposing himself to the female attendant." (Id., ¶ 7.)  On April 13, 2018, Boyd spoke with Officer Jones "regarding Mr. Thorpe's indecent exposure incident occurring on September 7, 2016.  At [Boyd's] request, [Officer] Jones provided Officer Holland with Durham Police Department's police report of the indecent exposure incident, and Officer Holland provided the report to [Boyd]. [Defendant] did not previously have Durham Police Department's report." (Id., ¶ 8.)

"After speaking with [Officer] Jones and reviewing the police report provided, [Boyd] concluded that Mr. Thorpe had exposed

himself to the BP Family Fare attendant before in the past." (Id., ¶ 9.)  In that regard:

> As part of [her] investigation, [Boyd] also contacted the female gas station attendant and spoke with her on the phone in early May, 2018.  She informed [Boyd] that Mr. Thorpe had exposed himself to her in the past and that the September 7, 2016 incident was not an isolated event, and that each time it occurred had been upsetting to her. She also informed [Boyd] that Mr. Thorpe had exposed himself to another female attendant in the past.  The female gas station attendant and [Boyd] discussed the possibility of Mr. Thorpe returning to [Defendant], and she informed [Boyd] that she felt he should not return because of his history of exposing himself, and the fact that his job might bring him into contact with a vulnerable patient population.  This was . . . all new information to [Defendant].

(Id., ¶ 10.)

Boyd provided the information from her investigation to her supervisor, who decided to send it to Defendant's Office of Institutional Equity "because th[at] is the [Office] within Duke University that investigates sexual harassment complaints." (Id., ¶ 11.)  "On or around May 10, 2018, Mr. Thorpe's investigation file was sent to Cynthia Clinton" with that Office.  (Id., ¶ 12.) Finally, on June 15, 2018, Boyd sent "Clinton the video showing the indecent exposure incident" and informed her that Boyd "had spoken with the BP attendant who stated that she and another female attendant had both been flashed by Mr. Thorpe." (Id., ¶ 13.)

In the interim, Gibson, Mr. Thorpe, "and Duke Human Resources" met on April 26, 2018, at which meeting "Human Resources simultaneously gave [Gibson and Mr. Thorpe] two letters.  One

letter claimed to reinstate Mr. Thorpe's employment, while the other letter stated that Mr. Thorpe was suspended pending an investigation" (Docket Entry 15-1, ¶ 17) into "the same incident of alleged indecent exposure that occurred on September 7, 2016" (Docket Entry 15-10, ¶ 20). Addressed to Mr. Thorpe, with a "Cc:" to Gibson, both letters bear the signature of Antwan Lofton and the date of April 26, 2018. (Docket Entries 15-5, 15-6.)[9]

---

9    On October 15, 2018, Plaintiff submitted affidavits of Gibson and Mr. Thorpe in support of its Confirmation Motion and Defendant submitted an affidavit of Lofton in support of its Dismissal Motion. (See Docket Entries 14-1, 15-1, 15-10, 17-1.) Lofton's affidavit states that "[Defendant] reinstated Mr. Thorpe to his former position as a Floor Finisher in Environmental Services working at Duke North Hospital effective May 1, 2018." (Docket Entry 17-1 at 3.) Lofton further avers:

> Mr. Thorpe was informed that he should not report to work until he and [Lofton] could first meet, but that he would be paid in the meantime as if he were working. On May 14, 2018, [Lofton] met with Mr. Thorpe and explained that he would be suspended with pay while Duke investigated the sexual assault, [Lofton] wrote a letter to Mr. Thorpe and [Plaintiff] to explain the situation and avoid miscommunication. Although [Lofton] signed the letter on April 26, 2018, [Lofton] did not provide the letter to Mr. Thorpe until [they] met on May 14, 2018.

(Id.)    In response to Lofton's assertions, Gibson filed a supplemental declaration, which states, in relevant part:

> As [Gibson] stated in [his] earlier declaration, on or about April 26, 2018, [Gibson] met with [Mr.] Thorpe and Duke Human Resources. Mr. Antwan Lofton was Duke's representative at that meeting and gave [Gibson] the two letters attached to [Gibson's] earlier declaration. At the meeting, [Gibson] spoke on Mr. Thorpe's behalf as his Union representative. Mr. Thorpe said very little in this meeting. The meeting was very short.

(continued...)

As relevant here, one letter states that, "[a]s a result of the decision rendered by Arbitrator Robert W. Kilroy on December 20, 2017, reducing [Mr. Thorpe's] termination on October 20, 2016 to a 30 working day suspension, [Mr. Thorpe is] reinstated effective May 1, 2018 to [his] position as a Floor Finisher in Environmental Services," with payment "for all lost wages beginning December 2, 2016 and up through May 1, 2018, less interim earnings." (Docket Entry 15-5 at 1.) The other letter states, in pertinent part:

> [Lofton is] writing to inform [Mr. Thorpe] that the University is conducting an investigation into [his] actions of exposing [his] genitalia to others, including the incident at the BP Gas Station on University Avenue on Wednesday, September 7, 2016, and other dates. Effective immediately, [Mr. Thorpe is] being placed on Suspension (with pay) pending the outcome of the investigation.

---

9(...continued)
        At some point around this time, Mr. Lofton indicated that Duke wanted Mr. Thorpe to submit a written statement. [Gibson] told Mr. Lofton that Mr. Thorpe had already been examined at the arbitration, that there was a lawsuit pending regarding the enforcement of the [A]rbitration [A]ward, and that if Duke wanted any further information from Mr. Thorpe about issues addressed at the arbitration it should direct those requests to the Union's attorney.

(Docket Entry 18-1, ¶¶ 2, 3 (paragraph numbering omitted).)
Defendant did not directly address the apparent discrepancy between Lofton's and Gibson's affidavits (see Docket Entries 20, 21), but did thereafter concede that "[Defendant] informed Thorpe in writing on April 26, 2018 that he was placed on suspension with pay pending further investigation of the criminal charges" (Docket Entry 20 at 19 (citing Docket Entry 15-6)).

Please forward to [Lofton's] office [Mr. Thorpe's] written statement concerning this matter by May 3, 2018. . . .

(Docket Entry 15-6 at 1.)

On April 27, 2018, Plaintiff's attorney wrote the following to Defendant's attorney:

As you are aware, on December 20, 2017, Arbitrator Kilroy issued an award requiring that Duke University reinstate [Mr.] Thorpe to his employment as a floor finisher. After Duke failed to comply with the Arbitrator's award, on March 20, 2018 the Union filed an action in federal court seeking confirmation and enforcement of the award.

Yesterday, Duke provided the Union a letter stating Mr. Thorpe would be "reinstated" as of May 1, 2018. Duke simultaneously provided a second letter stating that Mr. Thorpe would immediately be placed on suspension pending the outcome of an investigation into the alleged criminal conduct that was exhaustively discussed at the arbitration. Duke also requested that Mr. Thorpe complete "a written statement concerning this matter" by May 3, 2018. It is unclear what "matter" Duke wished Mr. Thorpe's statement to address.

Duke's proposal to "reinstate" and then immediately suspend Mr. Thorpe constitutes a flagrant violation of the Arbitrator's award and the [CBA]. Mr. Thorpe has already provided a statement about the allegations brought against him — he was questioned at length about the alleged indecent exposure at the arbitration, under oath. The Arbitrator nevertheless reinstated Mr. Thorpe to his position without precondition. Duke cannot now suspend Mr. Thorpe to further investigate alleged misconduct covered by the arbitration. If Duke continues in this manner, the Union will seek immediate enforcement from the District Court, including an award of attorneys' fees.

Regarding Duke's request for a statement from Mr. Thorpe, we refer Duke to Mr. Thorpe's testimony at the arbitration on November 9, 2017. Should Duke wish to request any other information from Mr. Thorpe or the

> Union regarding topics covered by the arbitration, please
> address those requests to me.

(Docket Entry 15-7 at 1-2.)

On June 14, 2018, Gibson, Mr. Thorpe, and Plaintiff's attorney
met with Clinton. (See Docket Entry 15-1, ¶ 21; see also Docket
Entry 15-10, ¶ 22; Docket Entry 18-1, ¶ 4.) Gibson characterized
"[t]he meeting []as confusing at first because Ms. Clinton appeared
unaware of the earlier arbitration." (Docket Entry 18-1, ¶ 4.)
When Gibson "brought up the arbitration" regarding "the 2016
incident. . . .[,] Clinton said that she had not known about it."
(Docket Entry 15-1, ¶ 22.) During this meeting,

> Clinton interviewed Mr. Thorpe about the same alleged
> incident of indecent exposure that had been addressed at
> the arbitration. Clinton asked questions about many of
> the same topics that were discussed at the arbitration,
> including what happened in the convenience store on
> September 7, 2016, the circumstances surrounding Mr.
> Thorpe's criminal charges, and the circumstances
> surrounding the dismissal of Mr. Thorpe's criminal
> charges.

(Id., ¶ 21; accord Docket Entry 15-10, ¶ 22; Docket Entry 18-1,
¶ 4.)

At this meeting, Mr. Thorpe denied exposing himself,
"explain[ing his] understanding of the voluntary dismissal,
including how [he] was required to complete community service
before the case would be dismissed," and "that [he] had not been
required to admit guilt in order to obtain the voluntary
dismissal." (Docket Entry 15-10, ¶ 22; see also id., ¶ 9 ("[Mr.
Thorpe's] criminal attorney told [him] that the dismissal did not

24

require [him] to admit guilt. [He] do[es] not recall ever

admitting guilt to the offense. [He] would not have admitted guilt

to the offense because [he] did not expose [him]self, and [is] not

guilty of indecent exposure.").) "[Mr. Thorpe's] explanation was

consistent with his testimony at [the] arbitration." (Docket Entry

18-1, ¶ 4.)

"On or about July 13, 2018, [Defendant] sent [Mr. Thorpe] a

letter discussing the same alleged incident of indecent exposure

addressed at the arbitration. The letter stated that [Mr. Thorpe]

was terminated 'for just cause based on the egregious nature of

your unlawful conduct.'" (Docket Entry 15-10, ¶ 23.) More

particularly, the letter specifies:

> On March 28, 2018 [sic], [Mr. Thorpe] w[as] placed
> on Suspension Pending Investigation as a result of
> additional information resulting from the incident at the
> BP Gas Station on University Avenue on Wednesday,
> September 7, 2016.

> On June 14, 2018, [Mr. Thorpe] voluntarily met with
> Cynthia Clinton, Assistant Vice President of
> Harassment/Discrimination Prevention and Compliance,
> Office of Institutional Equity, Duke University. At this
> meeting, [Mr. Thorpe] w[as] accompanied by [Gibson] and
> [Plaintiff's counsel]. The reason for the meeting was to
> discuss allegations made by a BP Family Fare Cashier
> stating [Mr. Thorpe] exposed [his] genitals (penis) to
> her while she was at work on September 7 and had done the
> same thing in the store to other employee(s) [sic]

> *****

> During the interview with [Clinton, Mr. Thorpe]
> stated [he] w[as] unaware of any incident of exposure
> involving the BP Family Fare Cashier and when confronted
> by law enforcement, [he] stated [that he] did not expose
> [him]self. [Mr. Thorpe] also stated that after court

proceedings had occurred concerning the exposure, all charges in connection to the exposure incident were voluntarily dropped.

However, court records show that [Mr. Thorpe] w[as] not only charged with indecent exposure, [he] w[as] placed on Deferred Prosecution by Durham County. To be placed on Deferred Prosecution means [he] had to admit responsibility for [his] actions. As part of this plea, [he] had to perform 30 hours of community service which had to be completed by 1/23/17 at a non-profit agency. [He] w[as] also placed on 12 months of unsupervised probation. It meant that if [his] record remained clean for 12 months, the charges would be dropped and the incident removed from [his] record, which is what happened.

The actions [Mr. Thorpe] committed constitute sexual harassment and sexual assault and are a violation of Work Rule #17, which states, in part, "Behavior which compromises another's' [sic] safety or privacy..." [Mr. Thorpe's] termination is for just cause based on the egregious nature of [his] unlawful conduct.

Therefore, [Mr. Thorpe's] employment with Duke University and Duke University Health System is terminated effective July 13, 2018.

(Docket Entry 17-1 at 7-8 (final ellipsis in original).)[10]

A few days later, Plaintiff filed a grievance regarding this termination. (See id. at 4.) The grievance asserts that Defendant violated "Article 11, Arbitration," "Article 13, Disciplinary

_____

10    Although the termination letter specifies 12 months of unsupervised probation (see id. at 7), Lofton's affidavit characterizes it as 12 months of supervised probation (see id. at 4). However, the only North Carolina criminal filing in the record reflects that Mr. Thorpe "was placed on probation pursuant to . . . deferred prosecution" on October 17, 2016, and, "[p]ursuant to [his] fulfillment of the terms and conditions of probation imposed" on October 17, 2016, the state prosecutor "enter[ed] a voluntary dismissal of all charges" due to successful completion less than four months later, on January 30, 2017. (Docket Entry 15-2 at 1; accord Docket Entry 15-13 at 1.)

Action," and "[Letter of Understanding] page 133, Timely Issuance of Disciplinary Actions." (Id. at 9.)[11] It further identifies four issues: (1) "Whether [Mr. Thorpe] was disciplined in contravention of the Arbitrator's Award issued on December 20, 2017," (2) "Whether [Mr. Thorpe] was disciplined for just cause," (3) "Whether [Mr. Thorpe] violated Work Rule #17," and (4) "Whether [Mr. Thorpe] was disciplined in a timely manner." (Id.) Finally, the grievance states:

> The Union maintains that [Mr. Thorpe] has not been reinstated as required by the [Arbitration] Award and that [Mr. Thorpe's] discipline contravenes th[e Arbitration] Award. The Union is enforcing the [Arbitration] Award in [the instant action]. The Union believes that the federal lawsuit is the appropriate forum in which to resolve this dispute. The Union is filing this grievance without prejudice to its ability to pursue relief in the federal enforcement proceeding.

(Id.)

---

11  The "Letter of Understanding," entitled "Timely Issuance of Disciplinary Action," states:

> The Union and [Duke] agree that disciplinary actions issued to employees should be done in a timely manner. The focus should be on corrective behavior at or near the time of the occurrence. In some circumstances, i.e. an extensive investigation, an extended absence or other unusual circumstances, the appropriate corrective action may not be administered in as timely of a manner.

> Disciplinary Actions, which have become inactive, should not remain part of the employee's file. Once removed from the file the disciplinary actions should not be used in determining further disciplinary actions or be a part of files transferred to other departments.

(Docket Entry 1-1 at 68.)

Thereafter, Defendant filed the Dismissal Motion, contending that it complied with the Arbitration Award, rendering this lawsuit moot. (See Docket Entry 13 at 1.) That same day, Plaintiff moved to confirm and enforce the Arbitration Award (see Docket Entry 15 at 1), maintaining that Defendant has "refused to comply with [the Arbitration Award]" (Docket Entry 16 at 1). Plaintiff subsequently filed a response in opposition to Defendant's Dismissal Motion (see Docket Entry 18), and Defendant filed its own opposition to the Confirmation Motion (see Docket Entry 20).

**DISCUSSION**

### I. Jurisdictional Challenge

According to Defendant, it "has fully complied with and satisfied the [A]rbitration [A]ward," and thus, "pursuant to [Rule 12(b)(1) of the] Federal Rule[s] of Civil Procedure [(the "Rules")], Plaintiff's claim is now moot and the Court lacks subject matter jurisdiction over the dispute." (Docket Entry 13 at 1.) "The Union, however, refuses to concede that [Defendant complied with the Arbitration Award] and asks that [the Court] confirm this award." Brown & Pipkins, LLC v. Service Emps. Int'l Union, Local 32BJ, 846 F.3d 716, 728 (4th Cir. 2017).

"[U]nder Article III of the Constitution, the conflict between the litigants must present a 'case or controversy' both at the time the lawsuit is filed *and* at the time it is decided." Ross v. Reed, 719 F.2d 689, 693 (4th Cir. 1983) (emphasis in original); see

also id. at 693-94 (explaining that, "[i]f intervening factual or legal events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented"). As the United States Court of Appeals for the Fourth Circuit recently explained, "[a] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome. A case becomes moot *only* when it is impossible for a court to grant any effectual relief whatever to the prevailing party." Brown & Pipkins, 846 F.3d at 728 (citation and some internal quotation marks omitted) (emphasis in original).

As a preliminary matter, a "live" controversy exists between the parties regarding whether or not Defendant complied with the Arbitration Award. (See, e.g., Docket Entry 15-7 at 1 ("Duke's proposal to 'reinstate' and then immediately suspend Mr. Thorpe constitutes a flagrant violation of the Arbitrator's [A]ward and the [CBA].").) On this basis alone, the Court should reject Defendant's request to dismiss this case as moot. See Brown & Pipkins, 846 F.3d at 728-29 (rejecting mootness contention and "find[ing] that confirmation of [an arbitration award] is proper because a live controversy regarding the award exists" even though the defendant allegedly twice paid the money ordered by the arbitration award, which payment the plaintiff "refuse[d] to concede," and explaining that, along with certain other factors,

"the [u]nion's insistence that a controversy still exists convince [the Fourth Circuit] that it is not impossible to grant any effectual relief by affirming the confirmation of the [award]"); see also Fraternal Order of Police Metro Transit Police Labor Comm., Inc. v. Washington Metro. Area Transit Auth., 780 F.3d 238 (4th Cir. 2015) (analyzing merits of dispute over employer's compliance with arbitration awards, where union contended that employer only temporarily complied with arbitration awards).

In addition, in this case, "the relevant facts — for jurisdictional and merits purposes — are inextricably intertwined," Kerns v. United States, 585 F.3d 187, 195 (4th Cir. 2009), involving as they do one core question: whether or not Defendant complied with the Arbitration Award. (Compare, e.g., Docket Entry 1, ¶ 27 (asserting that Defendant failed to comply with the Arbitration Award), Docket Entry 15-7 at 1 (asserting that Defendant's simultaneous reinstatement and suspension of Mr. Thorpe violates the Arbitration Award), and Docket Entry 16 at 13 ("Because Arbitrator Kilroy had already ordered that Mr. Thorpe was entitled to his job notwithstanding the September 7, 2016 incident, Duke's decision to fire him a second time based on the same incident is a flagrant violation of the arbitrator's award."), with Docket Entry 17-1 at 3 ("The reinstatement and payment [of back wages] fully satisfied the [A]rbitration Award."), and Docket Entry 20 at 1 ("Duke did not take a 'second bite of the apple' when it

suspended Mr. Thorpe in May of 2018 and ultimately terminated his employment in July of 2018 for sexual harassment and sexual assault in violation of Work Rule 17.").) As such, the "[C]ourt should assume jurisdiction and assess the merits of [Plaintiff's] claim." <u>Kerns</u>, 585 F.3d at 195.

Moreover, because the Court should "not dismiss under Rule 12(b)(1), it is entitled to treat [Defendant's] Rule 12(b)(1) motion as a direct attack on the merits under Rule 56(c)." <u>Id.</u> at 193 n.6. Accordingly, the Court should deny Defendant's jurisdictional challenge and instead construe its Dismissal Motion as a Rule 56 request for summary judgment.

## II. Compliance Challenge

Turning to the merits, "the question in this case is not whether the [A]rbitration [A]ward[ is] valid — the parties do not dispute that [Arbitrator Kilroy] had the power to order [Defendant] to reinstate [Mr. Thorpe] and that the [Arbitration A]ward[] w[as] valid when issued. Rather, the question is whether [Defendant] complied with the [A]ward[]." <u>Fraternal Order of Police</u>, 780 F.3d at 242. In this regard, Plaintiff contends that Defendant has yet to comply with the Arbitration Award (<u>see generally</u> Docket Entries 1, 16), whereas Defendant maintains that it fully complied with the Arbitration Award by placing Mr. Thorpe on the payroll and paying him his lost wages on or around May 1, 2018 (<u>see, e.g.,</u> Docket Entry 6, ¶ 27 ("Defendant states that it reinstated Mr. Thorpe

effective May 1, 2018 and fully paid him the monetary award due. Defendant has fully complied with and satisfied Arbitrator Kilroy's award.")).  Both positions fall short.

As an initial matter, Defendant errs in maintaining that the Arbitration "Award set no deadline for reinstatement, nor did it provide a deadline for the payment of lost wages/benefits" (Docket Entry 20 at 7).  (See id. at 10, 20; see also Docket Entry 17 at 1-3.)  Rather than leaving the timing to Defendant's discretion, the Arbitration Award contemplated immediate reinstatement, as it gave Mr. Thorpe only ten days to submit an itemized statement of "all interim earning to date of reinstatement."  (Docket Entry 1-7 at 6 (emphasis added).)  In addition, the Arbitration Award effectively mandated "payment of lost wages/benefits" (Docket Entry 20 at 7) within 60 days.  (See Docket Entry 1-7 at 6 ("The Arbitrator shall retain jurisdiction in the matter for 60 days to determine any disputes as to the above remedies . . . ."); see also Docket Entry 15-3 at 33 ("The Union requests that the Arbitrator retain jurisdiction for a reasonable period to allow the parties to calculate the value of any back pay to which Mr. Thorpe is entitled.").)  Accordingly, Defendant violated the Arbitration Award by not promptly reinstating and reimbursing Mr. Thorpe.

The question of whether Defendant violated the Arbitration Award when it belatedly reinstated and thereafter disciplined Mr. Thorpe raises a number of complicated issues.  Arbitration exists

to ensure, <u>inter alia</u>, "the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." <u>Apex Plumbing Supply, Inc. v. U.S. Supply Co.</u>, 142 F.3d 188, 193 (4th Cir. 1998).  As such, parties are "obliged to raise at arbitration all matters that [a]re relevant to the outcome of the case."  <u>United Food & Commercial Workers, Local 400 v. Marval Poultry Co.</u>, 876 F.2d 346, 352 (4th Cir. 1989); <u>see also Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co.</u>, 442 F.2d 1234, 1238 (D.C. Cir. 1971) ("Unless parties are bound by the records made before the arbitrators, the piecemeal or staggered submission of evidence would be likely to erode the effectiveness of arbitration as a speedy and efficient forum for resolving labor disputes." (internal quotation marks omitted)).

Furthermore, "parties may not seek a 'second bite at the apple' simply because they desire a different outcome.  'To permit such attempts would transform a binding process into a purely advisory one.'"  <u>Remmey v. PaineWebber, Inc.</u>, 32 F.3d 143, 146 (4th Cir. 1994) (quoting <u>Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Commc'ns Int'l Union</u>, 973 F.2d 276, 282 (4th Cir. 1992)).  Therefore, "[the Fourth Circuit] and other courts have consistently held that 'a party to arbitration cannot voluntarily engage in the arbitration of the issues submitted to the arbitrator and then attack the award on grounds not raised before the arbitrator.'"  <u>Rock-Tenn Co. v. United Paperworkers Int'l Union</u>,

184 F.3d 330, 334 (4th Cir. 1999); accord District 17, United Mine Workers of Am. v. Island Creek Coal Co., 179 F.3d 133, 140 (4th Cir. 1999).

However, an arbitration award requiring reinstatement does not forever protect an employee from future discipline. See Chicago Newspaper Guild v. Field Enters., Inc., Newspaper Div., 747 F.2d 1153, 1156 (7th Cir. 1984). Rather, "[o]nce reinstated, [an employee] would be in the same position as any other employee of [the employer], and would be subject to any lawful disciplinary action, layoff, or discharge." Id. In appropriate circumstances, therefore, an employer may discipline a reinstated employee based "on independent grounds that were never before the arbitrator[]" without "violat[ing an] earlier arbitration award[]." Fraternal Order of Police, 780 F.3d at 243.[12]

Here, Plaintiff contends that, at the arbitration, "[t]he parties . . . exhaustively litigated whether the September 7, 2016 incident provided just cause for Mr. Thorpe's termination" (Docket Entry 16 at 11), and "[b]ecause Arbitrator Kilroy . . . ordered that Mr. Thorpe was entitled to his job notwithstanding the

_____

12  Admittedly, this rule "may invite abuse by unscrupulous employers who reinstate an employee for a token period of time only and then take further questionable action against the employee," Field Enters., 747 F.2d at 1156 n.5, and raises difficult questions regarding "precisely how independent the reason for a second termination must be in order to fall outside the scope of an action seeking to enforce an arbitration award that orders reinstatement," Fraternal Order of Police, 780 F.3d at 243 n.5.

September 7, 2016 incident, Duke's decision to fire him a second time based on the same incident is a flagrant violation of the [Arbitration A]ward" (id. at 13). In turn, Defendant maintains that, although "Arbitrator Kilroy acknowledged that an incident at the BP occurred [on September 7, 2016]" (Docket Entry 20 at 15), "[h]e focused solely on the evidence concerning the time card violation and the issue of whether [Mr.] Thorpe intentionally falsified a record" (id.), such that his "2018 termination was for independent grounds" (id. at 16). (See id. at 11-16.) Resolution of these competing positions requires a close reading of the Arbitration Award.

To begin, the parties and the Arbitration Award broadly characterize the issue presented as: "Was there just cause to discharge [Mr. Thorpe]?" (Docket Entry 1-7 at 4; accord Docket Entry 15-3 at 3; Docket Entry 15-4 at 2; see also Docket Entry 1-7 at 3 (identifying as relevant contractual provision Article 5, which states that Defendant possesses "the right to . . . suspend, discipline and discharge employees for cause").) In addition, the Arbitration Award lists as a relevant contractual provision Rule 15 (see Docket Entry 1-7 at 3), which Plaintiff's post-arbitration brief identifies as the appropriate Work Rule "[i]f Duke wanted to discipline Mr. Thorpe for the alleged misconduct giving rise to the criminal charge" (Docket Entry 15-3 at 29). The Arbitration Award also mentions the allegation of indecent exposure on September 7,

2016, and resulting criminal charge against Mr. Thorpe. (Docket
Entry 1-7 at 2.) Further, it discusses the reputational harm to
Duke "to have and hold an employee charged as [Mr. Thorpe] with a
particularly unpleasant and distasteful crime." (Id. at 5.)
Finally, it notes the disposition of Mr. Thorpe's indecent exposure
charge, including the State's "Deferred Prosecution" and subsequent
dismissal of "the matter" in January 2017. (Id.) These
considerations, viewed in isolation, support the position that the
arbitration encompassed the alleged indecent exposure on September
7, 2016.

However, other aspects of the Arbitration Award make clear
that Arbitrator Kilroy construed the issue before him more
narrowly, focusing on whether Duke had "just cause" under Rule 13
to discharge Mr. Thorpe. In this regard, the Arbitration Award
states that, "[b]ased on the evidence, the arguments of the parties
and the [CBA,] the Arbitrator finds no just cause to discharge [Mr.
Thorpe] for a violation of Work Rule 13." (Id. at 4 (emphasis
added).) It further proclaims: "The Arbitrator draws his
jurisdiction and authority from the four corners of the [CBA]. He
does not sit to disperse his own brand of justice . . . . The
Arbitrator's function is to weigh the evidence of the alleged
violation of the work rule." (Id. at 5.) Consistent with this
statement, the Arbitration Award addresses whether Mr. Thorpe's

conduct[13] violated Work Rule 13 (which provides for immediate discharge (<u>see</u> Docket Entry 15-3 at 5; <u>see also</u> Docket Entry 1-3 at 4)) or, instead, Work Rule 3 (which provides for progressive discipline (<u>see</u> Docket Entry 15-3 at 5; <u>see also</u> Docket Entry 1-3 at 2)). (Docket Entry 1-7 at 4-6.) Finally, although it discusses harm to Defendant's reputation from Mr. Thorpe's receipt of a criminal charge, the Arbitration Award neither addresses the "well-defined parameters for when arrests for off-duty misconduct can support an employee's termination" (Docket Entry 15-3 at 29) (which, according to Plaintiff, requires proof, <u>inter alia</u>, that the employee "actually engaged in the misconduct" (<u>id.</u> at 30)) nor analyzes the applicability of Work Rule 15 (which, in relevant part, requires a finding that the employee "commi[tted] a work-related crime while off campus" (Docket Entry 1-7 at 3)). (<u>See</u> <u>id.</u> at 4-6.)

In sum, Arbitrator Kilroy construed the arbitral issue as whether Duke had just cause under Rule 13 to discharge Mr. Thorpe for his actions on September 7, 2016. "The arbitrator's interpretation of the scope of the issue submitted is entitled to deference[] . . . ." <u>Richmond, Fredericksburg & Potomac R.R.</u>, 973 F.2d at 280. Finding that Defendant lacked just cause in

---

13 In particular, the Arbitration Award focuses on the duration and timing of Mr. Thorpe's absence, as well as on his "swip[ing] in . . . and swip[ing] out" at work on September 7, 2016 (Docket Entry 1-7 at 5). (<u>See</u> <u>id.</u> at 4-6.)

discharging Mr. Thorpe under Rule 13, the Arbitration Award ordered Defendant to reinstate Mr. Thorpe and make him whole for all lost wages and benefits, subject to offset from any interim earnings. (See Docket Entry 1-7 at 4, 6.) Effective May 1, 2018, Defendant reinstated Mr. Thorpe to the payroll and paid him his lost wages. (See Docket Entry 15-5 at 1; Docket Entry 15-6 at 1; Docket Entry 17-1 at 3; Docket Entry 15-10, ¶¶ 21, 24.) Defendant continued to pay Mr. Thorpe until it terminated him again on July 13, 2018. (See Docket Entry 17-1 at 4; Docket Entry 15-10, ¶ 24.) By returning Mr. Thorpe to the active payroll and paying all back pay, Defendant belatedly complied with the Arbitration Award's order to reinstate Mr. Thorpe. See Fraternal Order of Police, 780 F.3d at 242 ("The [union] recognizes that [the employer] *initially* complied with the arbitration awards. For, at oral argument before us and before the district court, the [union] acknowledged that placing the [employees] on paid administrative leave constituted at least temporary reinstatement." (emphasis in original)).[14]

"The question, then, is whether terminating [Mr. Thorpe for an alleged pattern of sexual misconduct under Rule 17] constitutes

---

14 Although Defendant suspended Mr. Thorpe effective April 26, 2018 (Docket Entry 15-6 at 1), and reinstated him effective May 1, 2018 (see Docket Entry 15-5 at 1), the parties treat the suspension and reinstatement as simultaneous events (see Docket Entry 15-1, ¶ 16; Docket Entry 16 at 8; Docket Entry 17 at 4; Docket Entry 17-1 at 3), raising no arguments that the antecedent nature of the suspension affected the subsequent reinstatement. (See generally Docket Entries 16, 18, 20, 24.)

non-compliance with the [A]rbitration [A]ward[]." Id. Defendant maintains that the subsequent termination involves allegations of indecent exposures to separate individuals on separate dates, not just the alleged indecent exposure incident on September 7, 2016. (See, e.g., Docket Entry 17-1 at 7; Docket Entry 20-1, ¶¶ 9, 10; but see Docket Entry 17 at 4-5 (arguing, in Defendant's Dismissal Motion memorandum, that additional alleged incidents involved the same individual as incident on September 7, 2016).)

Plaintiff counters that Defendant's post-arbitration brief argues that separate exposure incidents occurred. (See Docket Entry 24 at 2-3 ("At the arbitration, Duke relied in part on Duke Police Officer Holland's hearsay regarding accusations raised by the gas station attendant, including his statement that she claimed Mr. Thorpe had exposed himself on multiple occasions." (citing Docket Entry 15-4 at 6).) Although Defendant's post-arbitration brief does state that a second incident occurred, it cites no evidence on point (see Docket Entry 15-4 at 6), and its description of the alleged second incident conflicts with the evidence before this Court (compare id. (asserting that second exposure occurred when Mr. Thorpe returned to the BP after September 7, 2016), with (Docket Entry 1-7 at 2 (stating that no exhibition occurred on that occasion), and Docket Entry 20-1, ¶¶ 9, 10 (asserting that additional alleged exposures occurred "in the past").) Moreover, nothing in the current record suggests that the other alleged

exposures involved any time card or other record-related issues implicating Work Rule 13. (<u>See, e.g.</u>, Docket Entry 20-1, ¶¶ 9, 10; Docket Entry 17-1 at 3-4, 6-8.)

Accordingly, at least some portion of the current dispute may fall "outside the scope of what was before the arbitrator," <u>Fraternal Order of Police</u>, 780 F.3d at 243 n.4, as Arbitrator Kilroy defined the issue (<u>see</u> Docket Entry 1-7 at 4). Under these circumstances, rather than attempting to resolve whether and to what extent Defendant's subsequent discipline of Mr. Thorpe involved the same or related matter(s) encompassed by the Arbitration Award, the Court should find that Plaintiff's 2018 "grievance[, which asserts that Defendant violated the Arbitration Award and CBA (<u>see</u> Docket Entry 17-1 at 9)] belong[s] before [an arbitrator], not a federal court," <u>Fraternal Order of Police</u>, 780 F.3d at 244.[15]

_____

15  Given the above-discussed ambiguity in the record regarding the basis for the second termination and the absence of controlling authority on "precisely how independent the reason for a second termination must be in order to fall outside the scope of an action seeking to enforce an arbitration award that orders reinstatement," <u>Fraternal Order of Police</u>, 780 F.3d at 243 n.5, the parties likely would have to engage in significant discovery, followed by more briefing (and perhaps an evidentiary hearing), if the Court chose to go further. (<u>See</u> Docket Entry 11 at 2 (stating, in the parties' Joint Rule 26(f) Report, that, "[s]hould the Court conclude that discovery is necessary following the submission of dispositive motions, the parties request they be permitted to hold a supplemental 26(f) conference at that point to discuss and submit a discovery plan"); <u>see also</u> Text Order dated July 31, 2018 (adopting Joint 26(f) Report).) Resolution of issues pertaining to the second termination — already raised by the Union in a separate
(continued...)

## III. Attorney's Fees

Finally, "Plaintiff respectfully moves the Court to award it reasonable attorneys' fees and costs incurred in this litigation." (Docket Entry 15 at 1.)  A court may award attorney's "fees in actions brought under [Section] 301" of the Labor Management Relations Act in appropriate circumstances, Marval, 876 F.2d at 350, namely, where a party "unjustifiably refuses to abide by an arbitrator's award," Media Gen. Operations, Inc. v. Richmond Newspapers Prof'l Ass'n, 36 F. App'x 126, 133 (4th Cir. 2002).  Two standards govern this assessment:

> Where a challenge goes to the fundamental issues of arbitrability or of whether an arbitration award "draws its essence" from the contract, the standard for assessing its justification is . . . the relatively lenient one of whether it has "any arguable basis in law."  Because these challenges go to fundamental questions of the arbitrator's very power to act, they must be considered sufficiently "justified" for this purpose unless there is literally no reasonably arguable legal support for them.

> Where, however, the challenge goes not to issues of the fundamental power of an arbitrator to make an award but to the merits of an arbitrator's award as made, the standard of justification is much more stringent. Indeed, because such challenges, if undeterred, inevitably thwart the national labor policy favoring arbitration, they must be considered presumptively unjustified.

Marval, 876 F.2d at 351 (citation omitted).

------

15(...continued)
grievance (see Docket Entry 17-1 at 4) — should proceed much more rapidly under the CBA.  (See Docket Entry 1-1 at 13-15 (detailing procedures and timeframes for grievance hearings and arbitration).)

Defendant argues against awarding attorney's fees on the grounds that "[t]here is no evidence of bad faith in the present case, and [Defendant] clearly has 'reasonably arguable legal support for its actions.'" (Docket Entry 20 at 21.) However, the "relatively lenient" standard of whether Defendant acted in bad faith or without an arguable basis in law does not govern this case. <u>Marval</u>, 876 F.2d at 351. Defendant does not challenge "the fundamental issues of arbitrability or of whether [the A]rbitration [A]ward 'draws its essence' from the [CBA]," so the "presumptive non-justification" standard applies. <u>Id.</u>; <u>see also</u> <u>id.</u> at 352 (explaining that "[t]he critical distinction is [whether the defendant's challenge is] to an arbitrator's award as made rather than to threshold arbitrability or to a total departure from the labor contract's 'essence'").

Here, Defendant contended that "[t]he Award did not set any deadline for the reinstatement to occur" or "for the payment of lost wages" (Docket Entry 17 at 1-2). As discussed above, the Arbitration Award (read reasonably) contemplated immediate reinstatement and prompt repayment of lost wages, with the outer limits for such actions set at 10 and 60 days from the date of the Arbitration Award. (<u>See</u> Docket Entry 1-7 at 6.) Rather than complying with those directives, "Duke refused to reinstate Mr. Thorpe" (Docket Entry 15-1, ¶ 15), forcing Plaintiff to "initiate[] this legal action" (<u>id.</u>, ¶ 16; <u>see generally</u> Docket Entry 1) to

secure compliance with the Arbitration Award. Accordingly, Plaintiff remains entitled to its attorney's fees through May 1, 2018, the date that Defendant reinstated and repaid Mr. Thorpe (see Docket Entry 15-5 at 1).

## CONCLUSION

A live controversy exists regarding Defendant's compliance with the Arbitration Award. Defendant did not timely comply with the Arbitration Award's requirement that Defendant reinstate Mr. Thorpe and reimburse him for his lost wages. However, Defendant belatedly reinstated Mr. Thorpe and paid all accrued backpay, as well as his salary through the date it terminated him a second time. An arbitrator, rather than this Court, should address Plaintiff's objections to that subsequent discipline.

**IT IS THEREFORE RECOMMENDED** that the Dismissal Motion (Docket Entry 13) and Confirmation Motion (Docket Entry 15) be granted in part and denied in part as follows: (1) Defendant's Rule 12(b)(1) request to dismiss this lawsuit as moot be denied; (2) Plaintiff's request to confirm the Arbitration Award be granted insofar as Defendant failed to timely reinstate and repay Mr. Thorpe; (3) Plaintiff's request to confirm the Arbitration Award be denied insofar as it seeks a finding that Defendant's 2018 discipline of Mr. Thorpe contravened the Arbitration Award, as, under the circumstances of this case, that issue belongs before an arbitrator; and (4) Plaintiff be awarded reasonable attorney's fees

attributable to its litigation efforts through May 1, 2018, as established pursuant to procedures provided under Federal Rule of Civil Procedure 54(d)(2).

This 6th day of September, 2019.

_____/s/ L. Patrick Auld_____
**L. Patrick Auld**
**United States Magistrate Judge**
